IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BEVERLY HACEESA, INDIVIDUALLY, and
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF HARDY HACEESA, and
FIRST FINANCIAL TRUST COMPANY,
As Conservator for SHENOEL HACEESA,
A Minor,

        Plaintiffs

       vs.                      CIVIL NO. 99-0060 MV/RLP-ACE

UNITED STATES OF AMERICA,

       Defendant.

## DEFENDANT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

    COMES NOW Defendant, the United States of America, by and through its undersigned attorneys, and proposes the following Findings of Facts and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

    1.  On April 25, 1998, a Saturday, at approximately 8:39 p.m. Hardy Haceesa, a 23 year old male, presented to the Indian Health Service ("IHS") Northern New Mexico Medical Center Shiprock, New Mexico, ("Shiprock"), emergency room complaining of chest discomfort along with difficulty breathing, fever (taking Tylenol), and generalized aches and pains.  (Medical records for Hardy Haceesa dated April 25, 1998.)

    2.  Mr. Haceesa was seen by an intake nurse who recorded complaints of chest discomfort along with difficulty breathing, subjective fevers, pain on breathing, and generalized aches and pains, but no cough.  (Medical records for Hardy Haceesa dated April 25, 1998.)

3.   Mr. Haceesa was also evaluated by Ms. Shelly Rhodes, a nurse practitioner ("NP"), who recorded a history of mid-sternal chest pain for two days.  Her note records that the patient reported that the symptoms began five days prior.  The notes indicate that the patient reported that he had entered into a trailer with mice.  NP Rhodes recorded a history on April 25th of fever, nausea, sore throat, no cough, and pain on inspiration. (Testimony of Shelley Rhodes, Nurse Practitioner; medical records for Hardy Haceesa from Shiprock dated April 25, 1998.)

4.   Shelly Rhodes is an employee of the Indian Health Service (United States of America) employed at the Northern Navajo Medical Center in Shiprock, New Mexico.

5.   The physical exam indicated a temperature of 101.7°F, pulse 98, BP 139/77, oxygen saturation on room air 98%.  NP Rhodes noted that the patient was alert but "appears ill."  The pharynx was injected (congested), but no other abnormalities were found on examination.  (Medical records from Shiprock dated April 25, 1998.)

6.   NP Rhodes ordered various tests and laboratory studies including a complete blood count (CBC).  The CBC revealed a slightly low total white blood count at 4.2 K/uL, a normal mechanical differential, a slightly low platelet count at 111K/uL (normal range 130K/uL - 400K/uL), a slightly abnormal mean cell hemoglobin and mean platelet volume, both of which had also been seen on a prior visit dated June 21, 1997.  (Hematology Profile contained in medical record for Hardy Haceesa from Shiprock.)

7.   A chest x-ray was obtained.  The x-ray report indicates that there was no acute infiltrate, effusion or pneumothorax,  and no active disease noted. (Medical Records for Hardy Haceesa from Shiprock, PA and Lateral Chest x-ray report dated 4/25/98.)

2

8.  An ECG was obtained and was normal for a young thin male, and was notably without tachycardia. (Medical Records for Hardy Haceesa from Shiprock, ECG printout dated 4/25/1998 at 9:37:12 p.m.)

9.  An electrolyte panel was obtained, indicating a slightly elevated glucose level (113mg/dl) and urea nitrogen (19 mg/dl), and a low potassium (3.0 mmol/L).  All of the other indicators were within normal limits.  (Medical Records for Hardy Haceesa from Shiprock, dated 4/28/98.)

10.  NP Rhodes had Mr. Haceesa examined by Dr. Bharat Patel, a contract physician with the IHS working in the emergency room.  (Deposition of Shelly Rhodes; deposition of Bharat Patel, M.D.)

11.  Dr. Patel assessed the patient, reviewed the labs and, after eliciting a cough, stated a diagnosis of bronchitis.  He agreed with NP Rhodes' treatment plan.  (Deposition of Bharat Patel, M.D.)

12.  Mr. Haceesa was given one (1) liter of normal saline solution intravenously and 40 meq of potassium orally. He was given a prescription for erythromycin and ibuprofen. (Medical Records for Hardy Haceesa from Shiprock.)

13.  Mr. Haceesa was discharged at approximately 11:05 p.m. in stable condition and instructed to return to the Dzilnaodithle ("DZ") IHS clinic on Monday, April 27, 1998 for a recheck.  (Testimony of Shelley Rhodes, Nurse Practitioner; Medical Records for Hardy Haceesa from Shiprock dated April 25, 1998.)

14.    After treatment with one liter of intravenous fluids, Mr. Haceesa reported feeling better, and he walked out of the clinic. (Testimony of Shelley Rhodes, Nurse Practitioner; Medical Record for Hardy Haceesa from Shiprock dated April 25, 1998.)

15.    Saturday, April 25, 1998 at 11:05 p.m. was the last time Mr. Haceesa was seen or treated by any employee of the United States. (Medical Records of Hardy Haceesa from Shiprock.)

16.    On Monday, April 27, 1998, at 6:03 a.m., Mr. Haceesa sought treatment at the San Juan Regional Medical Center ("SJRMC"), a private facility in Farmington, New Mexico.  (Testimony of Beverly Haceesa.)

17.    Mr. Haceesa presented to the SJRMC Emergency Room ("ER") with complaints of nausea, vomiting, diarrhea, chest pain and abdominal pain.  (Testimony of Plaintiff's expert witness, Diane Goade, M.D.)  Despite the fact that SJRMC was aware that Mr. Haceesa had been seen at Shiprock IHS within 48 hours, no attempt was made to contact the Shiprock ER.

18.    The ER examination consisted of a physical examination and laboratory tests. Despite complaints of chest pain and a recent diagnosis of bronchitis, a chest x-ray was not done.  (Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

19.    Mr. Haceesa had abnormal vital signs with an elevated pulse and a low blood pressure, consistent with dehydration.  His initial oxygen saturation was listed as 92% which was low normal for a 23 year old healthy male.  He was noted to be febrile, despite taking ibuprofen for fever.  His pulse was elevated at 120.   (Medical records for Hardy

4

Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

20.  On physical examination, Mr. Haceesa was noted to have been ill for two or three days with sore throat and pain in chest on breathing, he had increased nausea and vomiting and diarrhea since going to Shiprock and he had abdominal tenderness in the right lower quadrant and in the periumbilical region.  He had a left conjunctival injection. His lungs were noted to be clear on auscultation.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

21.  Clinically, Mr. Haceesa was obviously markedly ill.  (Testimony of Plaintiff's expert witness, Robert C. Henry, M.D.)

22.  The laboratory evaluation for Mr. Haceesa on Monday, April 27, 1998 performed at SJRMC was significant for normal total white blood cell count; however there was a marked "left shift" with juvenile neutrophils seen.  The platelet count was markedly decreased at 51 K/uL.  The liver transaminases were increased, in the 200-300 U/L range. The serum bicarbonate level was low, even though Mr. Haceesa appeared dehydrated. The total bilirubin was not significantly elevated, nor was the amalyse.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

23.  Mr. Haceesa was given a diagnosis of conjunctivitis and hepatitis (acute viral hepatitis).  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

24.  Mr. Haceesa was treated with Phenergan and three liters of lactated Ringer's solution by IV which stabilized his blood pressure at 124/68.  A prescription was written for Phenergan; erythromycin was stopped.  Mr. Haceesa was told to be seen at Shiprock in one week and to return as needed.  He was released.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Robert C. Henry, M.D.)

25.  Mr. Haceesa presented again to SJRMC on Tuesday, April 28, 1998 approximately 24 hours after his previous ER visit.  His presenting complaints were noted as nausea, vomiting, diarrhea, thigh pain, blurred vision and dizziness when standing. (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

26.  Mr. Haceesa's temperature was 97.5, his pulse was 119, his respiratory rate was 24, his blood pressure was 81/51, and his oximetry (room air) was 95%. The patient had a low blood pressure and rapid pulse.  His oxygen saturation was normal, however, his respirations were rapid.  By 8:30 a.m., the oxygen saturation began to drop.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witnesses, Diane Goade, M.D. and Robert C. Henry.)

27.  An IV was initiated, with administration of Ativan (a benzodiazepine sedative and anxiety reducing agent) twice, apparently for complaints of muscle aches and cramping.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

28. Clinically, Mr. Haceesa was gravely ill.  Blood could not initially be drawn from the right wrist, secondary to depleted volume. (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Robert C. Henry, M.D.)

29. The CBC is highly significant for a platelet count of 14 K/uL and a white blood count of 38.4 (normal range 4.8 - 10.8).  Both of these values are remarkable and very alarming.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

30. By this time, Mr. Haceesa was showing low blood pressure, respiratory symptoms and a dropping oxygen saturation.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane Goade, M.D.)

31. Mr. Haceesa continued to receive IV fluids; four liters had been given by approximately 9:05 am causing massive pulmonary fluid overload.  Mr. Haceesa was given Lorazepam 2 mg despite the fact that he was markedly hypotensive, potentiating further hypotension.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Robert C. Henry.)

32. A chest x-ray was obtained at approximately 9:45 am.  (Medical records for Hardy Haceesa from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Robert C. Henry.)

33. Around 10:00 am, despite his unstable condition, SJRMC attempted to transfer Mr. Haceesa to Shiprock by private vehicle.  One hour later, after having been in the

emergency room for three hours, transfer was still being arranged, however it was decided

at that time that ambulance transfer was necessary.  (Testimony of Plaintiff's expert

witnesses, Robert C. Henry and Diane Goade, M.D.)

34.  Mr. Haceesa finally received blood cultures and antibiotics for a sepsis type of

presentation four hours after presentation at the ER.  (Medical records for Hardy Haceesa

from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane

Goade, M.D.)

35.  Since he was too unstable to be transferred to Shiprock, Mr. Haceesa was

admitted to the ICU at SJRMC at 11:20 am, and was emergently intubated to support his

respirations.  An evaluation was performed.  At that time, a differential diagnosis was

made, including Hantavirus pulmonary syndrome  ("HPS") and sepsis.  Mr. Haceesa was

treated repeatedly with sodium bicarbonate for acidosis and an agent to support blood

pressure, norepinephrine, was begun at a low dose.  (Medical records for Hardy Haceesa

from SJRMC  submitted by Plaintiff's lawyer; Testimony of Plaintiff's expert witness, Diane

Goade, M.D.)

36.  At 1:40 p.m., transport to University of New Mexico Hospital (UNMH) was

arranged, and the transport took place at approximately 3:15 p.m.  He was dead on arrival

at UNMH.

37.  Hantavirus pulmonary syndrome (HPS) is a viral infection carried by deer mice

in the southwestern United States and cotton rats in the southeastern United States.  The

disease has been reported in 31 states and in Canada.  (Testimony of Defendant's expert

witness, Douglas Mapel, M.D.)

38.   There have been over 202 cases of HPS diagnosed since January 1, 1994. Approximately 40% of all Hantavirus cases were diagnosed in the States of New Mexico, Arizona, Utah, and Colorado.   Prior to April 25, 1998, no Hantavirus cases had been seen at Shiprock IHS.  (Testimony of Plaintiff's expert witness, Diane Goade, M.D.; Testimony of Defendant's expert witness, Douglas Mapel, M.D.; Testimony of Chris Percy, M.D.)

39.   The clinical presentation and clinical course of HPS is highly variable and the majority of those individuals who survive the hantavirus cardio-pulmonary syndrome are debilitated and have permanent injuries.   (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

40.   Early diagnosis of HPS is extremely difficult because the most common signs and symptoms are identical to those of other, less severe viral illnesses.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

41.   The survival rate for patients with HPS is around 50%, and those individuals who survive are debilitated and have lingering progressive problems.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

42.   The screening protocol for HPS is basically a two step process. The initial history and physical examination provide the first step of screening.  The second step of the screening protocol for HPS is based on the CBC (Complete Blood Count).  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

43.  In 1998, the most common presenting symptoms of HPS were:  fever (102-104); myalgias (non-specific); gastrointestinal symptoms (nausea/vomiting/diarrhea); cough; and headache.   Uncommon presenting symptoms of HPS include: sore throat;

rash; sinusitis; otalgia; pleuritic pain; shortness of breath; and, low back pain).  (Testimony of Chris Percy, M.D.; Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

44.   In 1998 there were characteristic hematologic findings for HPS shown by a CBC, namely:  1) thrombocytopenia (low platelet count) of less than 100 K/uL; 2) the presence of immunoblasts, an unusual lymphocyte precursor; 3) hemoconcentration, which is usually manifested as a hematocrit above 50%; and 4) increased white blood count with many immature leukocytes with a left shift, and circulating immunoblasts.  (Testimony of Chris Percy, M.D.; Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

45.   In 1998, if a patient had a clinical presentation suspicious for HPS, a CBC was drawn to look for evidence of these characteristic blood changes.  Those who had any of the first three findings in the paragraph above were to be immediately referred to UNMH. Those with normal or equivocal CBCs were to have follow up within 1 to 2 days if they continued to have symptoms.  At that time, a repeat CBC would be drawn to see if the patient had developed the characteristic HPS findings.  (Medical records for Mr. Hardy Haceesa; Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

46.   Chest radiographic abnormalities are noted on admission in most patients, even when dyspnea (shortness of breath) is not present.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

47.   Mr. Haceesa's presenting complaints and physical findings were a mixed collection of factors consistent with HPS infection (exposure to mice, fevers, body aches, nausea) and other factors that argued against Hantavirus infection (sore throat, chest

pains, pharyngeal injection (congestion), shortness-of breath without hypoxemia.)

(Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

48.  Mr. Haceesa's CBC from blood drawn on April 25, 1998 at Shiprock was

unremarkable except for the slightly low platelet count (111 K/uL.)  Unfortunately, a low

platelet count is very non-specific and also not uncommon.   The only way to assess a

normal or mildly decreased initial platelet count is to follow the trend over time.  In a person

who is hemodynamically stable, not hypoxemic, and does not otherwise have any

indication for admission, this may be done as an outpatient.  (Testimony of Defendant's

expert, Douglas Mapel, M.D.)

49.  Of significance, the hemotologic findings for Mr. Haceesa on April 25, 1998 did

not show leukocytosis with a left shift, which is characteristic for HPS.  In comparison, on

April 27, 1998, when Mr. Haceesa was seen in the SJRMC, there was a marked "left shift"

seen on the white blood cell count with markedly abnormal leukocytes.  (Testimony of

Defendant's expert witness, Douglas Mapel, M.D.; Testimony of Plaintiff's expert witness,

Diane Goade, M.D.)

50.  Of significance, the hematologic findings for Mr. Haceesa on April 27, 1998

show a platelet count which has fallen from 111K/uL to 51K/uL which is a significant and

alarming drop.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.;

Testimony of Plaintiff's expert witnesses, Diane Goade, M.D. and Robert C. Henry, M.D.)

51.  On April 25, 1998, the CBC was not remarkable.  If the staff at Shiprock had

called Dr. Mapel at UNMH for a consult, he would have told them to give the patient a

macrolide antibiotic to cover for atypical respiratory infections and have him come for a

follow up in about 24 hours to be examined.  If the patient's symptoms at follow up persisted or worsened, another CBC would be done to recheck the platelet count. (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

52.  On April 25, 1998, the staff at Shiprock Hospital did exactly what Dr. Mapel would have told them to do with regard to the care and treatment of Mr. Haceesa. (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

53.  Mr. Haceesa was appropriately treated by administration of a macrolide antibiotic to cover for atypical respiratory infections and appropriately instructed to follow-up in about 24 hours at another IHS facility to be examined.  His condition on April 25, 1998 did not require hospitalization.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

54.  The orders contained in the Shiprock medical records for Hardy Haceesa on April 25, 1998 to return on April 27, 1998 to the DZ clinic for a recheck were appropriate and would have allowed the IHS to compare historical information on Mr. Haceesa from April 25th to April 27th. (Testimony of Plaintiff's expert witness, Diane Goade, M.D.; Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

55.  Mr. Haceesa's symptom complex and clinical findings on April 25, 1998, were not specific for any diagnosis, and his presentation was unusual for HPS.  At the point that Mr. Haceesa was seen at Shiprock, one could not accurately give any diagnosis based on the information that was available.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

56.  The diagnosis of "bronchitis" given to Mr. Haceesa on April 25, 1998 did not affect the outcome of this case because the care and treatment given to Mr. Haceesa on April 25, 1998 at Shiprock Hospital were consistent with the care and treatment which would have been appropriate for a differential diagnosis containing "suspected HPS." (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

57.  There is no medical evidence that Mr. Haceesa should have had blood drawn and sent to UNMH at midnight, April 25, 1998 for testing.  At UNMH, after normal working hours, technicians can only be called in by a UNMH physician, and this is usually only done in emergency situations.  Non-emergency specimens are usually held until the next working day, which in the case of Mr. Haceesa would have been Monday, April 27th.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

58.  The only place in this part of the country that these tests can be done is at UNMH and, even under the best of circumstances, it takes several hours for even the fastest courier service to transport a sample to UNMH.  Even the fastest techniques for Hantavirus serology processing require 4-6 hours under optimal circumstances. (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

59.  Hantavirus serologies are unnecessary as a screening tool because the characteristic CBC changes (dropping platelet count, presence of immunoblasts, hemoconcentration and many immature leukocytes) have excellent sensitivity.  When suspected HPS patients are transferred to UNMH, the initial management is based completely on the CBC findings, including the initiation of extracorporeal membrane oxygenation (ECMO).  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

60. UNMH does not perform cultures from serums. Hantaviruses can only be cultured in "Level 4" biohazard laboratories, such as those at the Centers for Disease Control. Hantavirus cultures have no utility as a screening test in primary care settings. (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

61. Even if Mr. Haceesa had followed up at the DZ IHS hospital on April 27, 1998 as instructed, or even if he had presented at SJRMC on April 27, 1998 with a platelet count of 51 Ku/L and had been referred to UNMH that day, his probability for survival was poor. (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

62. There was no deviation from the standard of care when Mr. Haceesa was seen and treated at Shiprock Hospital on Saturday night, April 25, 1998. (Testimony of Defendant's expert witness, Douglas W. Mapel, M.D.)

63. The work up in the emergency room at Shiprock on April 25, 1998, was appropriate. (Testimony of Plaintiff's expert, Diane Goade, M.D.).

64. Even with the most advanced care available for Hantavirus syndrome, Mr. Haceesa's probability of survival was less than 50%.

65. Staff at Shiprock received yearly continuing medical education briefings covering plague and HPS, among other diseases.

66. Mr. Haceesa's presentation on April 27, 1998 at SJRMC was compatible with the prodromal (early) phase of HPS. In particular, the laboratory evaluation was very suggestive of HPS, including the leftward shift noted on the white blood cell count and the decreased platelets. (Testimony of Plaintiff's expert witness, Diane Goade, M.D.).

14

67.  Mr. Haceesa's presentation on April 28, 1998 was entirely consistent with the cardiopulmonary phase of HPS.  Mr. Haceesa was profoundly hypotensive, tachycardic and in respiratory distress.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

68.   Defendant's expert witness, Dr. Douglas W. Mapel, is board certified in Internal Medicine with board certifications in the subspecialties of critical care and pulmonary disease.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

69.  Defendant's expert witness, Dr. Douglas W. Mapel, has been employed at the University of New Mexico Health Sciences Center and has consulted on HPS patients and has been a clinician treating HPS patients.  (Testimony of Defendant's expert witness, Douglas Mapel, M.D.)

70.  Plaintiffs filed a separate action before this same Court against SJRMC for negligence based upon the care and treatment provided to Mr. Haceesa on April 27-28, 1998, and Plaintiffs have settled that case.  See  Haceesa, et al. v. SJRMC, CIV 99-193 MV/RLP (Order dismissing action filed October 13, 2000.)

71.  Plaintiffs filed an action in New Mexico State Court against the individual physicians at SJRMC and SJRMC alleging negligence in the care and treatment of Mr. Haceesa on April 27-28, 1998.  See First Financial Trust Co., Beverly Haceesa, et al. v. SJRMC, Russell Hill MD, Kenneth Stradling MD, New Mexico Second Judicial District Court No. CV-98-11986.   Plaintiffs have settled with SJRMC in that action, leaving only the physician defendants.

## PROPOSED CONCLUSIONS OF LAW

1.   Venue is properly laid in this District.

2.   The United States District Court for the District of New Mexico lacks subject matter jurisdiction over Plaintiff's Complaint for Medical Negligence and Wrongful Death. The proper party, the Estate of Hardy Haceesa, did not bring this action within the applicable statute of limitations under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2401(b).  Any amendment of the Complaint to add the proper party which relates back to the Complaint originally filed by Plaintiffs is untimely pursuant to 28 U.S.C. §2675(a). Plaintiff Beverly Haceesa, Individually, and Shenoel Haceesa, who filed their cause of action timely, are not the proper parties in this wrongful death action.          3.   The substantive law governing this case is the FTCA (28 U.S.C. § § 1346(b), 2671 et seq.) and the applicable law of the State of New Mexico.

4.   In accordance with the language of 28 U.S.C. § 1346(b) of the FTCA, the United States' liability is to be determined by the application of the law of the place where the act or omission occurred.

5.   In treating Hardy Haceesa on April 25, 1998, the medical personnel employed by Shiprock were under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified medical personnel practicing under similar circumstances giving due consideration to the locality involved.  UJI 13-1101.

6.   There was no deviation from the standard of care nor were employees of the United States of America negligent when Mr. Hardy Haceesa was seen and treated at the Indian Health Service Shiprock Emergency Room on Saturday night, April 25, 1998.

16

7.  The evaluation by Nurse Practitioner Shelly Rhodes and a contract physician, Bharat Patel, M.D. of Mr. Hardy Haceesa on April 25, 1998, met the standard of care.

8.  The laboratory (CBC) and other tests, including the ECG and the chest x-ray, given to Mr. Hardy Haceesa on April 25, 1998, met the standard of care for screening  for Hantavirus Pulmonary Syndrome (HPS).

9.  The medical work-up which Mr. Hardy Haceesa received on April 25, 1998 at Shiprock IHS met the standard of care in 1998 for the evaluation of suspected HPS.

10.  Based on the standard of care for screening for HPS, Mr. Hardy Haceesa's laboratory results on April 25, 1998 did not indicate that he had HPS.

11.  The standard of care was met by employees of Shiprock when Mr. Haceesa was not hospitalized on the night of April 25, 1998.

12.  The basic test for establishing loss of chance is no different from the elements required in other medical malpractice actions: duty,  breach, loss or damage, and causation.  Alberts v. Schultz, 975 P.2d 1279, 1283, 126 N.M. 807 (1999).

13.  The Plaintiffs bear the burden of proving each of these elements.  Id.

14.  A critical issue in a lost chance action is not whether the Defendant owed the patient a duty, but whether that duty was breached by the Defendant's failure to timely or properly diagnose the presenting problem and follow an appropriate course of treatment. Id., at 1284.

15.  The injury is the lost opportunity of a better result, not the harm caused by the presenting problem.  It is not the physical harm itself, but rather the lost chance of  avoiding physical harm.  Alberts v. Schultz, 975 P.2d 1279, 1284-85, 126 N.M. 807 (1999).

17

16.  The Plaintiffs must present evidence that the harm from the presenting medical problem was, in fact, made worse by the lost chance.  Id. at 1285.

17.  Plaintiffs must show by a preponderance of the evidence that the alleged negligence of the employees at the Shiprock IHS facility resulting in the lost chance for a better result.  The probability of a causal link between negligence and injury must be supported by the weight of the evidence.  Id. at 1286.

18.  The burden of proving reasonable medical probability rests with Plaintiffs, and a causal connection between the alleged acts of malpractice and Mr. Hardy Haceesa's loss of chance for survival cannot be substantiated by arguments based on conjecture, surmise, or speculation.  Id. at 1288.

19.  The testimony introduced by Plaintiffs to establish proximate cause must show to a reasonable degree of medical probability that the Defendant's negligence caused the loss of the chance for a better result.  Id.

20.  Plaintiffs cannot show to a reasonable degree of medical probability that had treatment for Hantavirus Pulmonary Syndrome (HPS) been initiated on the night of April 25, 1998 at the Shiprock IHS facility Mr. Hardy Haceesa  would have survived.

21.  Medical personnel at Shiprock used the knowledge, skill and care ordinarily used by reasonably well-qualified physicians and health care providers.  The medical personnel in the Shiprock ER met the standard of care when Mr. Hardy Haceesa was seen, evaluated, diagnosed and treated on April 25, 1998.

22.  On April 25, 1998, employees of Defendant at the Shiprock IHS did not breach a duty to Mr. Haceesa because they met the standard of care for diagnosis of Mr.

18

Haceesa's medical condition at that time, and the employees of Defendant at the Shiprock IHS followed an appropriate course of treatment, including instructing Mr. Haceesa to return to an IHS facility.

23.  Mr. Haceesa would not have had a measurably increased chance of survival if he had been hospitalized at Shiprock IHS on April 25, 1998.

24.  The fact that Mr. Haceesa was not hospitalized at Shiprock IHS on April 25, 1998 did not, to a reasonable degree of medical certainty, proximately cause a lost chance of recovery.

25.  In emergency room settings, it is expected that patients will assume responsibility to follow up with their providers based on discharge instructions.

26.  The medical personnel in the Shiprock Emergency Room met the standard of care when they released Mr. Hardy Haceesa at 11:05 p.m. on April 25, 1998, and instructed him to return for follow up at another IHS facility, the DZ Clinic, on April 27, 1998.

27.  The medical personnel at Shiprock told Mr. Hardy Haceesa such information as would customarily be communicated by a reasonably well-qualified medical care provider to a patient.

28.  Mr. Hardy Haceesa was negligent when he failed to present at the DZ clinic, or at any other IHS medical facility, on April 27, 1998 per his discharge instructions.

29.  Every patient has a duty to exercise ordinary care for his own health and safety. The patient's failure to exercise ordinary care to follow the doctor's reasonable medical advice is negligence.  N.M.U.J.I. Civ. 13-1110.

30.  There can be no negligence on the part of employees of Defendant at the Shiprock IHS or any employees of the United States after April 25, 1998 because Mr. Hardy Haceesa made the personal decision to seek medical care at the SJRMC where he was seen on April 27 and 28, 1998.

31.  The Plaintiffs have the burden of proving that the alleged medical negligence by personnel employed at the Shiprock IHS ER on April 25, 1998 was the proximate cause of Mr. Hardy Haceesa's death.

32.  The Plaintiffs have failed to establish that the care and treatment given to Mr. Hardy Haceesa on April 25, 1998 at the Shiprock ER was the proximate cause of his death on April 28, 1998.

33.  Others, not employed by the United States of America, deviated from the standard of care and were negligent in the care and treatment of Mr. Hardy Haceesa.

34.  There is no evidence of negligence on the part of employees of the United States of America.

35.  Judgment for Defendant United States of America.

Respectfully submitted,

NORMAN C. BAY
United States Attorney


JAN ELIZABETH MITCHELL
Assistant U. S. Attorney
Box 607
Albuquerque, NM  87103
(505) 346-7274

I HEREBY CERTIFY that a true copy of the

foregoing pleading was mailed to opposing counsel
of record this <u>13th</u> day of March, 2001.

_____
Assistant U. S. Attorney

N:\JMitchell\Haceesa\proposed findings and conclusions