IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BEVERLY HACEESA, Individually, and
FIRST FINANCIAL TRUST COMPANY,
as Conservator for SHENOEL HACEESA,
A Minor,

                    Plaintiffs,

vs.                                                  CIV. No. 99-0060 MV/RLP

UNITED STATES OF AMERICA,

                    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** is before the Court on a bench trial held from April 2 through April 4,

2001. The Court having considered the pleadings, trial testimony, exhibits, relevant law, and

being otherwise fully informed, finds that Defendant United States of America did breach its duty

of care to Hardy Haceesa in failing to properly diagnose him with the hantavirus, thereby

depriving him of the loss of chance to receive proper medical care.

## I. BACKGROUND

Plaintiffs brought this suit alleging negligent treatment of 23-year-old Hardy Haceesa at

Northern New Mexico Navajo Hospital (NNMNH) in Shiprock, New Mexico on April 25, 1998,

which resulted in his death on April 28, 1998. Plaintiffs brought suit pursuant to the Federal Tort

Claims Act, 28 U.S.C. §§1346(b), 2671 et seq. On April 25, 1998, a Saturday, at approximately

8:39 p.m., Hardy Haceesa presented to NNMNH emergency room complaining of chest

discomfort, difficulty breathing, fever, pain on respiration, and generalized aches and pains. He

reported that he thought his condition might be related to exposure to deer mice.  Mr. Haceesa was seen by nurse practitioner Shelly Rhodes.

Ms. Rhodes recorded a history from Mr. Haceesa, performed a physical examination, and ordered a CBC and chest x-ray.  She asked a contract physician, Dr. Patel, who was spending his first day on the job at this hospital, to examine Mr. Haceesa.  Dr. Patel elicited a dry cough from Mr. Haceesa. Mr. Haceesa was diagnosed with bronchitis.  Prior to discharge, Mr. Haceesa was given one liter of intravenous fluids and prescriptions for erythromycin and ibuprofen.

Mr. Haceesa was discharged with instructions to return for a recheck two days later at the local clinic.

Saturday, April 25, 1998 at 11:05 p.m. was the last time Mr. Haceesa was seen or treated by any employee of the United States.  Mr. Haceesa sought treatment on Monday, April 27, 1998 and Tuesday April 28, 1998 from San Juan Regional Medical Center in Farmington, New Mexico. He died shortly after his arrival at University of New Mexico Hospital (UNMH) on April 28, 1998.  His post-death diagnosis was Hantavirus Pulmonary Syndrome.

Before making its findings of fact and conclusions of law, the Court will explain the credibility determinations upon which its findings are based.  The critical issue in this case was whether Nurse Rhodes' and the NNMNH administration's duty of care fell below the standard of care.  Plaintiff presented two experts to testify about the standard of care: Dr. Diane Goade and Dr. Robert Henry.  Plaintiff also introduced the transcript of Dr. Stephen Bowers' deposition, for support that the standard of care at UNNMNH was not met.  Specifically, Dr. Bowers, an emergency room physician at UNNMNH, indicated that the emergency room staff was told, prior to Mr. Haceesa's arrival, that in diagnosing hantavirus, the primary symptoms they should look

for were unspecified fever and myalgia; that the history that they should look for would be some
exposure to mice feces; that the lab value they were supposed to be looking for was primarily
platelets below 150,000; that the chest x-rays would often be unremarkable; that as of 1997, at
least, the staff was told that there was a blood assay available at the University of New Mexico;
and that it was clear that among the laboratory findings, the most reliable was the low platelet
count.  Plaintiff also introduced several brochures and articles demonstrating the state of the
medical knowledge about hantavirus.  Many of those publications were issued by the defendant's
various agencies, including Indian Health Services (IHS) and the Centers for Disease Control and
Prevention (CDC).  Beverly Haceesa, the decedent's wife, Jesse Haceesa, the decedent's mother
and John Scott, the decedent's employer, all testified that they, as lay people, were familiar with
the symptoms of hantavirus in the prodromal phase.

    In contrast, two doctors supported the defendant's position that the standard of care was
met by Nurse Shelly Rhodes and the hospital administration:  Dr. Percy and Dr. Mapel.  Both
doctors stated that the hospital simply did not have a duty to educate its emergency room
personnel about developments in the medical field.  They stated that each medical provider is
responsible for his or her own education.  As to Nurse Shelly Rhodes, both doctors stated that her
workup, diagnosis and follow-up plan for Hardy Haceesa met the standard of care.

    As to whether or not the defendant should have recognized Mr. Haceesa's presentation as
the prodromal phase of hantavirus, or whether the defendant should have at least been on alert
that hantavirus was a possible diagnosis, the Court credits Dr. Diane Goade's professional opinion
over Dr. Doug Mapel's.  Dr. Goade's practice, education, training and publications establish her
as the expert in diagnosing hantavirus patients, whereas Dr. Mapel's experience is with the

treatment of the disease.  She is a member of various collaborative study groups about hantavirus, and has presented extensively both nationally and internationally about hantavirus.  She is a member of the triage team at UNMH who screens and diagnoses patients for hantavirus.  In addition, Dr. Goade has been heavily involved in disseminating information to the public and to medical providers about the hantavirus.  Therefore, she is the authority about the state of the knowledge in the field about hantavirus, and specifically, how to screen for and diagnose the disease.

Dr. Goade testified also that the CDC was one of the primary agencies involved in understanding hantavirus and disseminating information about it.  Additionally, IHS was involved in disseminating information to the community about hantavirus.  Therefore, not only did the general medical community know about how to screen for and diagnose hantavirus, but the defendants knew.

Dr. Goade is also the director of the national hantavirus survivors study.  Therefore, the Court gives her opinions about the rate of survivorship, and the health of hantavirus survivors after they have recovered more weight than Dr. Mapel's.  As the lead investigator of the survivors study, Dr. Goade personally sees and diagnoses all the patients and evaluates the data.  Additionally, the Court finds that Dr. Mapel's testimony about Mr. Haceesa's chance of survival was not very persuasive.  Dr. Mapel testified that Mr. Haceesa's survival rate was less than 50 percent.  He stated that the survival rate depended only upon the patient's response to treatment, not how soon the disease was detected.  He stated that Mr. Haceesa's survival rate was the same on Sunday as it was on Monday.  However, Dr. Mapel did not state the medical or clinical basis for his opinion.  Although he has significant experience as a physician who treats

4

people with the hantavirus, he did not provide this Court with any basis for his conclusion that Mr. Haceesa's survival rate was less than 50 percent.  In contrast, Dr. Goade stated that the survival rate for Mr. Haceesa was 65 percent.  The basis for this opinion was a study put out the CDC.  This was a conservative figure, for Dr. Goade testified that the survival rate for the University of New Mexico Hospital was about 70 percent, which she knows from clinical experience.  Therefore, in addition to her own clinical experience, Dr. Goade had the findings of the CDC as support.  While Dr. Mapel did not credit the findings of the CDC, this Court does.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court issues the following findings of fact and conclusions of law.


## II. FINDINGS OF FACT

1.  Plaintiff Beverly Haceesa is a resident of the State of New Mexico, San Juan County. She is the wife of Hardy Haceesa, deceased, and the mother of Shenoel Haceesa.

2.  Plaintiff First Financial Trust Company is a corporation within the State of New Mexico, Bernalillo County.

3.  Beverly Haceesa is the Personal Representative of the Estate of Hardy Haceesa. Plaintiff First Financial Trust Company is the Conservator and guardian of Shenoel Haceesa.

4.  The Defendant United States of America operates the Indian Health Service, an agency of the government of the United States of America and, through it, owns and operates Northern New Mexico Navajo Hospital in Shiprock, New Mexico.

5.  In April, 1998, Hardy Haceesa was a twenty-three year old male, father of Shenoel Haceesa and husband of Beverly Haceesa.  He was employed as a construction worker and in the

course of his employment was routinely required to work in structures, buildings and houses
where it was possible, if not likely, that he could be exposed to deer mice.

6.  On April 25, 1998, at approximately 8:39 a.m. Hardy and Beverly Haceesa went to the
Northern New Mexico Navajo Hospital (NNMNH) because Hardy was complaining of chest
discomfort, difficulty breathing, fever and generalized aches and pains.

7.  At NNMNH, Hardy was treated by a nurse practitioner named Shelly Rhodes.  This
was Ms. Rhodes' first job out of nursing school, which she had completed six months earlier in
Tennessee.

8.  NNMNH did not have a regular physician available to take responsibility for the
evaluation, care and treatment of Mr. Haceesa.  They did have a contract physician, Dr. Bharat
Patel, who had been in the State of New Mexico for two days before the Haceesas came to the
NNMNH emergency room.

9.  When Mr. and Mrs. Haceesa spoke to Nurse Rhodes, they told her that they thought
Mr. Haceesa might be suffering from hantavirus.  Mrs. Haceesa overheard a conversation with
Nurse Rhodes and a male doctor where Nurse Rhodes relayed their concern that Mr. Haceesa
might have hantavirus, and asked him if there were any brochures around the hospital.

10.  Nurse Rhodes noted on examining Mr. Haceesa that he had difficulty breathing, sore
throat and nausea and that he was concerned that his symptoms "may be related to entering trailer
w/mice."  She ordered a CBC that showed that Mr. Haceesa had an abnormally low platelet count
(111,000) and low potassium.  She also noted that he had a fever and an overall poor general
appearance.

11.  As of this time Nurse Rhodes had received absolutely no education or training as to

6

the proper diagnosis of potential hantavirus for the defendant prior to the time she was required to evaluate and treat Mr. Haceesa. She did ask that Dr. Patel look at Mr. Haceesa, although she did not ask him to assume responsibility for Hardy's care. She did not report the platelet count to Dr. Patel.

12.   Dr. Patel, having been in New Mexico for only two days, had no better idea as to how to evaluate a potential hantavirus patient than did Nurse Rhodes. He did manage to elicit a dry and non-productive cough from Mr. Haceesa. However, Nurse Rhodes, not the doctor, remained the person responsible for Mr. Haceesa's care during the entire time he was seen and treated at NNMNH.

13.   Nurse Rhodes diagnosed Mr. Haceesa with bronchitis, prescribed erythromycin and ibuprofen, sent him home and told him to return to the local clinic near their home for a recheck in two days.

14.   Mr. Haceesa's symptoms were consistent with a typical patient suffering from the early stages of hantavirus, which include complaints of pain on breathing, fever, abnormally low platelet count, nausea, and exposure to rodent droppings. While cough occurs in a minority of cases, when present, it is characterized by a dry or non-productive cough of the kind Dr. Patel elicited from Mr. Haceesa.

15.   The fact that Mr. Haceesa also complained of a sore throat does not rule out hantavirus, or make it any more reasonable for the medical providers at NNMNH to have missed the diagnosis.

16.   The University of New Mexico Hospital had a hantavirus blood test available on a 24-hour, 7-day-a-week basis at the time Mr. Haceesa was seen at NNMNH. Results were available

within hours from the time they were submitted.  Despite the report of rodent exposure and despite the fact that this is an area of the country where more cases of hantavirus have been diagnosed than anywhere else, a blood test to determine the possibility of hantavirus was not taken from Mr. Haceesa and sent to the University of New Mexico Hospital.  Nurse Rhodes had no idea such a blood test was even indicated.

17.  Mr. Haceesa died of hantavirus three days later on April 28, 1998.  Between the time of defendant's negligence and the time of his death, he endured pain, suffering and emotional distress.

18.  The failure of the agents and employees of NNMNH to properly diagnose and manage Mr. Haceesa's hantavirus resulted in a loss of any chance he had to survive the disease. With proper diagnosis and treatment his chances of survival were approximately 65%.

19.  The present value of Hardy Haceesa's lost earning capacity is $1,454,191.

20.  The present value of Hardy Haceesa's loss of household services is $136,085.

21.  The value of Hardy Haceesa's loss of enjoyment of life is $1,012,000.  Plaintiff's expert testified that an average amount would be $10,000 a year.[1]  That amount, taking into account Mr. Haceesa's life expectancy, would be $506,000.  The Court finds that Mr. Haceesa's enjoyment of life was higher than most.  There were over 700 people in attendance at his funeral. He was well known and well liked in his community.  He was a young and happy man who enjoyed the satisfaction of a loving family, supportive and positive work environment and an active athletic life in basketball.  Therefore, the Court finds that Mr. Haceesa's enjoyment of life is

---

[1] The Court is mindful that expert testimony that attempts to quantify this number is not dispositive.  The Court merely accepts the expert's average calculation per year as reasonable and determines the final number based upon the evidence presented in this case.

well above average and values $1,012,000.

22.  The value of the pain and suffering Hardy Haceesa underwent between April 25th and his death is $100,000.

23.  The value of the emotional distress Hardy Haceesa underwent between April 25th and his death is $100,000.

24.  The funeral expenses incurred to bury Hardy Haceesa were $5,444.73.

25.  As a result of Hardy's death, Beverly Haceesa has suffered loss of consortium, including the conjugal fellowship of husband and wife, right to take company of the other, society, cooperation, affection, guidance and companionship.  The value of this loss is $250,000.

26.  As a result of Hardy's death, Shenoel Haceesa has suffered loss of parental guidance, counseling and companionship.  The value of this loss is $250,000.


### III.  CONCLUSIONS OF LAW

1.  The United States of America is the proper defendant in this case pursuant to 28 U.S.C. § 2679 (a) and (b).

2.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1346.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b).

4.  All administrative prerequisites for filing this suit set forth under 28 U.S.C. § 2675 have been met.

5.  Defendant is vicariously liable for the negligence of the agents and employees of NNMNH and the Indian Health Services, including the negligence of Nurse Practitioner Rhodes and the administration of NNMNH.

9

6.   Defendant did not possess or apply the knowledge nor did it use the skill and ordinary care ordinarily used by reasonably well-qualified healthcare providers practicing under similar circumstances, giving due consideration to the locality involved.

7.   Defendant, its agents and employees were negligent in their care of Hardy Haceesa on April 25, 1998 in the following respects:

(a)  failing to take an appropriate exposure and occupational history;

(b)  failing to recognize that Mr. Haceesa's clinical presentation was consistent with hantavirus;

(c)  failing to recognize that a blood test to determine whether Mr. Haceesa was suffering from hantavirus should have been sent to UNMH;

(d)  failing to recognize that Mr. Haceesa should have been admitted to NNMNH pending the results of a blood test to rule out hantavirus;

(e)  failing to recognize that Mr. Haceesa's clinical presentation was not consistent with bronchitis;

(f)  failing to recognize that they were not qualified to assess whether or not Mr. Haceesa was suffering from hantavirus and that they should have sought the advice of a healthcare provider who was so qualified;

(g)  failing to make any effort to see to it that the personnel charged with evaluating potential hantavirus patients in its NNMNH emergency room were properly trained or educated as to the diagnosis and treatment of such patients; and

(h)  failing to establish appropriate protocols in the management and assessment of patients presenting with symptoms of hantavirus.

8.  Defendant's negligence, as set forth above, proximately caused the loss of the 65% chance of survival that Mr. Haceesa would have had with proper diagnosis and treatment.

9.  Under New Mexico law, and in particular, *Alberts v. Schultz*, 975 P.2d 1279 (N.M. 1999), plaintiffs are entitled to recover damages in an amount directly proportional to the lost chance of survival for Hardy Haceesa that was the result of the defendant's negligence, which is 65%.

10.  Under New Mexico law, and in particular *Lujan v. Healthsouth Rehabilitation Corp.*, 902 P.2d 1025 (N.M. 1995), the negligence of the defendant is successive, and not concurrent with, any negligence of San Juan Regional Medical Center on April 27th and 28th, 1998.

11.  Neither is the defendant jointly liable with San Juan Regional Medical Center.  Under New Mexico law, and in particular *Lujan*, 902 P.2d at 1029-30, *Lewis v. Samson*, 992 P.2d 282, 293 (N.M. Ct. App. 1999) and NMSA 1978, § 41-3A-1(D) (1987), successive tortfeasors are simply liable for the entire enhancement if proximately caused by their negligence.

12.  The New Mexico cap on damages under the New Mexico Medical Malpractice Act does not apply in this case.  The cap only applies to negligence by a "health care provider," which is defined as "a person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant."  NMSA § 41-5-3(A).  Plaintiffs' claims against the hospital administrators who elected to provide absolutely no training to Nurse Rhodes, as well as their claims of negligence against Nurse Rhodes, are not capped under the statute.

13.  The total amount of damages to be awarded to plaintiffs, according to the

Conclusions of Law set forth above, is $3,307,720.73, less 35 percent, for a total of $2,150,018.47.

14.  The Court declines to aggravate the damages amount. Plaintiffs argue that there are aggravating circumstances surrounding the defendant's negligence and therefore that the damages award should be enhanced pursuant to § 41-2-3 NMSA 1978.  Plaintiffs argue that the defendant did absolutely nothing to educate its agents and employees as to how to recognize and deal with the expected, known and deadly threat of hantavirus, in light of the fact that NNMNH is in the geographic center of the world for this disease, that a renewed outbreak was publicized, and that Hardy and his wife both raised concerns that he might be suffering from the disease (although this is contested), and that the disease is so deadly.  Plaintiffs requested a $1.33 million enhancement.  However, the Court finds that the claims made by plaintiffs are reflected in the amount already awarded to plaintiffs as compensatory damages.  Therefore, the Court will not enhance the award.

15.  Pursuant to the Local Rules of this Court, plaintiffs are to submit a cost bill within 30 days of the date of entry of this Judgment.  Plaintiffs are also entitled to pre- and post-judgment interest.  In light of the fact that defendant made no offer of settlement or compromise prior to trial, the Court awards pre-judgment interest at 10% per annum, and post-judgment interest at the statutory rate.

### III.  RELIEF

Plaintiffs are hereby awarded $2,150,018.47 in compensatory damages against the United States, plus pre- and post-judgment interest and Plaintiffs' reasonable costs and expenses including attorneys' fees in amounts to be later determined.

Dated this 11th day of June, 2001.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>
James Lyle

<u>Attorney for Defendant</u>
Jan Mitchell

13